May it please the Court. My name is Mike Stanley. I'm here today representing Alaska-Trojan Partnership. With me today in the courtroom are our Principals of the Partnership, Ted Painter and David Capri. They've traveled up here to be present for this and we appreciate the opportunity and the privilege of appearing before you. Today I'm going to frame my remarks around this illustrative exhibit. This is actually just a recreation of something that's in our opening brief at page 27. And also at the Clerk's recommendation I've handed a little handout in for you to take a look at. And what this shows, this shows what the official license limitation program, and I'll use the word LLP for that, this shows what the LLP record would look like if it were corrected to show that the Alaska-Trojan harvested fish in the second state statistical area that were delivered on November 11, 1994. On your handout, at the bottom of your handout, I've actually did a little cut and paste of what the record actually shows. And that's from excerpt of record page 131. And the only real significance there is to note that in the existing record there's one line of harvest information, whereas what we're suggesting is that the record needed to be corrected to show two lines of harvest information. There's not really any dispute about that. The hearing officer found that the partnership had presented substantial evidence that the crab were taken in two different areas, half in each area. At two distinct times. Well, yes. And the government, in fact, for purposes of this brief, is answering brief at page 11, footnote 6, says they don't dispute this. So I'm just trying to suggest that this is what the record should look like, should show that there was crab taken in this area and in this area. And the question in this appeal then is, is this two harvests or is this one harvest? Now the LOP regulations define a documented harvest as a lawful harvest that was filed in compliance with federal and state commercial fishing regulations in effect at the time of harvesting. We submit that that definition is not ambiguous and that it plainly applies to each one of these lines of harvest information for several reasons. First, as indicated when we had the hearing with NMFS, NMFS presumed that each of these lines of harvest information indicates a lawful harvest that was recorded in compliance with state regulations. In other words, that's the very definition that we're talking about here. Second, and that's at Excerpt of Record 186, 187 through 190. Second, the administrator of the Restricted Access Management Division, which we often refer to as RAM, Mr. Smith, he acknowledged that each of these lines does in fact document a harvest in a common sense sort of way. In other words, if you think about a lawful harvest recorded in compliance, those are not complicated terms. Those are pretty straightforward terms that have a common sense understanding. And he said, yeah, each of these does document a harvest, but it's not a quote unquote documented harvest. Third, each of these lines of harvest information, in our view, represents a complete and discrete event. So the harvest of crab, the landing of the crab, and the reporting on a state of Alaska fish ticket. And I think moreover, what's important to understand in this case is that these harvests were separated in time and space. As recounted by the hearing officer, and I refer you specifically to Excerpt of Record 209, 210, the harvest that occurred in this area, 795, 200, was primarily in the first week of November of 1994. And after that week, on about November 8th, and this is reflected in their log book, which is in the record at 104, they picked up, they left the area, they went over to Kiska Island, tried fishing there, came back to the area, and then fished in this second state area. Let me ask you this. Under the government's theory of what constitutes a harvest, would it be a harvest if your clients had harvested crab of this, the brown king, in a certain area, gone in, offloaded it, gotten a fish ticket, gone right back out to exactly the same area, got another boatload of crab, brought that back in and landing. Would those be two harvests under the government's definition? Yes. Under the government's definition, there would be two fish tickets, and therefore, those would be two harvests. So for purposes of harvest, it doesn't matter that they might have been taken from the same place. That's correct. It's the fish ticket. Here they were taken from two different places, but for purposes of the definition of harvest, that's not essential. That's not essential, but it is essential for what I think is the central point of our argument, which is that because they were taken to two different places... Would that just help you show that they were really distinct events? Well, not only that, but it also shows that when they're reported, they're required by state law to be reported as separate harvests in the separate statistical area. And once they're reported, they're put into the state fish ticket file, and they acquire a separate identity as a harvest. The state fish ticket file recognizes them as separate harvests, and then that was carried over into the official record where they're recognized as separate harvests. So the fact that they're in different areas is important because that is what makes them have a separate identity. It helped me understand what's going on here. The qualifying period was 1994. Right. And the policy change in the definition of harvest was 1999, wasn't it? Correct. When did the fishermen discover the unique value of the third ticket? The LLP program was adopted in June of 1995, and that is when they said you had to have three documented harvests. Actually, the council, when they used the term, they said you need three landings, and we talked about that in our briefs. What did they understand by that term? In 1999, when RAM was getting ready to apply the program, that's when they came up with this, well, somebody asked a question, I guess we'll just, you know, one fish ticket equals one documented harvest, and that's that short memo that's in the record at page 43. But to follow up on Judge Goodwin's question, when they're actually out there taking these crab, they're unaware of the consequence that will be later attached to how many and where and offloadings and so on. That's correct. They're just out there fishing. That's correct. Okay. And to kind of illustrate the point, I think we've shown in the record, this is Excerpt of Record 198 through about 206, when we made a claim under the Unavoidable Circumstances Regulation. We said that actually they had planned to make a delivery in mid-November. They had actually made plans with the catcher processor out there. They tried to. But they couldn't. And so, well, he asked the question, well, what would the record look like if they had done that? Well, instead of November 24th, when they left to go to Kiska on the 8th, and obviously you'd have to have a different fish ticket number. So, you know, so you change a couple of the delivery details, and now you have two harvests. Even NIMS would say, yeah, that's the third fish ticket, that's good enough. Here's part of the way I see this case. Your definition of harvest seems to me a perfectly sensible definition of harvest. Yet the agency has some scope at defining a regulatory or statutory term, here a regulatory term, and I'm not sure your definition is the only available or reasonable definition of harvest. That doesn't necessarily seem to be fatal to your case. My problem is, and the government might as well hear my tentative thoughts on the matter right now, I'm tempted to see this as the government having chosen the only definition for harvest that's unavailable to them. Because their definition of harvest is it is synonymous with landings. And the regulatory chain says we're deliberately getting away from landings. So I'm not sure I need to get to your point of saying this has to be the definition of harvest, the one you want, although it's a perfectly plausible one. I think the government may be free to adopt some slightly different definition of harvest. But my problem is the one definition they chose I think is unavailable. And I think that is a central part of what we're trying to say, is that they are focusing on delivery rather than harvest. In fact, if you think about it, these details in here, the fish ticket, the date they were delivered, those are delivery details. Those have to do with the landing. That doesn't have anything to do with the harvest. The harvest details are over here. And what's interesting is that, like I say, you can change these dates, and you've still got two separate harvests. How many other people were getting permits under this system? And if we go with your argument, would that open up all the rest of the permits that were issued? They projected, the council projected that about 47 vessels, I believe, and this is in the record and I can give you specific size, about 47 vessels would qualify. Over a period of time, about 30 actually did qualify. Now, there were some other circumstances that came into play. But as far as who would qualify if you were to rule in our favor, only the Alaska Trojan Partnership would qualify for several reasons. One is that they're the only party in this case, so any relief you grant is only going to flow to them. Two, it's not clear that there are other people who are in a similar factual situation. The government speculates, but there's not been any showing. In fact, I submit it's probably unlikely. But more importantly, the deadline for making those claims was 1999. And NMFSS takes a pretty hard line on reopening the record to entertain claims. In fact, after this court decided in Ward's Cove that they had misinterpreted the IFQ regulations, there was potentially a pool of people who had been denied sablefish allocation who could have benefited. Well, NMFSS didn't reopen that application period and entertain a bunch of claims. The only people who benefited from the Ward's Cove decision was Ward's Cove itself. My other concern is that the council, the North Pacific Fishery Management Council, started all this in accordance with their duties under the law to manage the fisheries. And apparently, from what I can read, I may be wrong on this, but they used the three landings as their recommendation apparently in their review. Now, I may be wrong. Who came up with that? But it seems to fit into how they're going to limit boats and how they're going to limit the take. And so if the council reviewed it, the commission and the regulatory body reviewed it, we're now going to go back and use our expertise to give you two fish tickets based upon this complicated conservation thing. I'm having a hard time with that. In other words, these folks went through this, and apparently they're trying to do something relative to conservation of the ground crab. And I understand where you're coming from, but apparently we're going to make some sort of determination for this boat and this particular fish ticket in spite of all the other work that apparently studies have been done, I guess. I have two responses to that. First, we have no dispute with the three harvest requirement. The regulations say three documented harvests. We're not challenging that. You know, what we're challenging is the interpretation that RAM adopted kind of rather casually in June of 1999 when they came out with that little email. So we're not challenging what the council said. Also, if you look at the reason that the council gave for that three harvest requirement, and this is set forth at the excerpt of record page 30 of 63 Federal Register 52645, the council says we were going to require three harvests for brown crab and tanner crab because we don't want people qualifying on the basis of incidental harvests, meaning they're out fishing for one species and they happen to catch a few of the brown crab and sell them and therefore get the ticket. So we don't want that, and we want to make sure that people are going to remain in the fishery. This vessel, that previous summer, had invested three-quarters of a million dollars. I think that they fully intended to stay in the fishery, and in fact they've been in this fishery every year since that time. So it's not inconsistent with the council's intent. It would be our view that letting this vessel get this endorsement or awarding this endorsement to this vessel is exactly consistent with what the council's intent was. Except for the mechanics that have happened in the state system where they have the fish tickets and that sort of thing, and except for the fact that on that given day you might have landed two of them, or you might have delivered and got two fish tickets except for other circumstances. I guess the way I would say it is... I want to go there because you're asking us to equate the two areas that are put on one fish ticket as two tickets, and that's the state system. That's beyond us. No, as two harvests. Two harvests. Two harvests reported on one ticket. All right. And so you want us to separate the ticket. Now that was set up by the state. You pulled your boat in and got the thing done. Nobody did this except at your boat. Now we're trying to figure out how to get to where you are. Is it the fact that you were prevented from bringing in two, or is it the fact that the law, the regulation, and interpretation is wrong? It's the fact that the interpretation that RAM applied, their rule, their one fish ticket equals one documented harvest rule, we believe is not only contrary to the plain meaning of the term, of the definition of documented harvest, but it's also inconsistent with the intent of the LLP. That's our point. And I guess one way to try to drive that point home is to say it this way. The council never had this rule before. This is something, again, RAM came up with in that period of time when they were trying to figure out how to start implementing this thing. It was somebody raised a question, they had this little conversation, and they said, okay, well, this is the way we'll do it. Here it is. And this is not anything that the council ever looked at. This is not a council rule. This is not something that was promulgated according to Magnuson Act rulemaking. It doesn't have the force of law. And for those very reasons, that's why we say that the RAM rule is not entitled to Chevron-style deference. If you look at Christianson v. Harris County and the U.S.V. Meat Corp., we submit that that rule is entitled to fairly little deference. Again, RAM kind of came out and said, this is the way we're going to do it. No analysis, no rationale. There was a rulemaking going on at that time. On August 6, 1999, they published the rule by which they defined the official LLP record. It would have been a very easy thing for them, I guess, to do a rulemaking at that time which could have encapsulated their rule. They didn't. They just said, oh, here it is. This is the way we're going to do it. Anyway, I'd like to preserve the balance of my time. Thank you. Good morning, Your Honors. My name is James Kilborn from the Department of Justice. And with me at the council table is Jonathan Pollard from the Regional NOAA General Counsel's Office in Juneau, Alaska. As a preliminary matter, I would like to make sure that the Court is aware that we have submitted two supplemental citations of authority, one by way of a letter written to the Court last week, a letter dated July 7, and that was sent to the Court in San Francisco. And in that case, or in that letter, we cited to the Court this Court's recent decision in a case called Yakutak, Inc. v. Gutierrez, which was a challenge to the license limitation program, similar to the license limitation program at issue here. The citation to that case is 407 Fed 3rd 1054. And then this morning, we provided an additional supplemental citation of authority to the Court and to counsel, and this is to the Supreme Court's recent decision in a case called National Cable Telecommunications Association v. Brand X Internet Services, decided June 27, 2005. And the cite to that is 2005 Westlaw 1498-860. The issue in this case, or Alaska Trojan would have the issue in this case be whether its interpretation of the regulations is, it says that there is only one interpretation of the regulations, and that is consistent with the Court. That's not necessarily their only argument. How about the question that I asked him that I'll now address to you, not whether their definition of harvest is the only available definition, but rather whether your definition is the one definition that's not available? The rationale for my question is the regulation explicitly moves away from landings to harvests. Fish tickets measure landings, and yet you defined harvest by fish tickets, which measure landings. What the regulation says, or what the preamble explanation in the final rule at page 33 of the excerpts of record. Hang on a second. Okay, I'm on page 33. This is in the left-hand column, basically the first full paragraph under the heading, Changes to the Final Rule. It says, definition for the term documented harvest is added to the final rule. The term documented harvest replaces legal landing throughout the final rule. The new term more accurately describes the activity necessary for eligibility. It says it more accurately describes the activity. Included in the proposed definition of legal landing was the activity of offloading, and this says offloading is not necessary for eligibility. That is correct, but what is necessary is that there be a documented harvest. This regulation has defined documented harvest to mean a harvest recorded in compliance with federal or state law. For the crab fishery, this is basically a state-managed fishery, so we look to state law to see what is required. State law requires that the harvest be documented by issuance of a fish ticket. You're skipping a step. Let's see if we can establish this as a factual matter. The old definition of landing, the way you got a landing was you offloaded, and when you offloaded, you got a fish ticket, correct? Yes. And now you're saying the definition for the crab fishery purposes, not necessarily for ground fish because I understand you've got a different way of going about it than a fish ticket. This regulation for the crab fishery is the way you document a harvest is you document a landing, correct? And if you have one fish ticket, it doesn't matter that you might have fished in two different places, two different times, and done exactly as they've done. And, in fact, as I understand in the hearing, there was a statement that, well, if he'd come in after the first batch of brown crab and, in fact, offloaded and got a fish ticket, that would be a separate harvest, correct? That is correct. The change in this regulation from the term landing to documented harvest was intended to focus information on what NIMS wanted to record, have accurately recorded, was not where fish was landed, that is where it was offloaded, because it didn't do NIMS good really to determine the point of offloading. What they wanted to know is where the fish was harvested. Well, I'm not sure that's the only reason for the change because in the language that you're pointing me to, although you've not read the sentence yet, it's preceded by the word further. That is to say that sounds like it's an additional reason, not the only. I agree, but there is another reason is that, and you have to understand that this regulation applies to both the ground fish fishery and the crab fishery. This is a general regulation, so it is speaking to both of these fisheries. Am I right in understanding that as to ground fish, fish tickets are not necessary in the sense of you can fish for one species of ground fish for a while, you can then fish for another species of ground fish for a while, you can then offload those fish and get one fish ticket but have more than one harvest, is that correct? That is correct. That would be correct for crab though as well. If the fish ticket showed that there were two different species of ground fish or two different species of crab that were harvested, even if they were harvested in the same federal endorsement area, if there were two different species involved, that would result in two documented harvests. When you're harvesting the same species, the fact that you don't come in after one batch has been brought up and then you go for another batch, the fact that you didn't come in and offload, that's fatal. I wouldn't say it's fatal, it results in one fish ticket. In this case it's fatal. In this case it does not result in two documented harvests for them, so they did not qualify, that's correct. What's the rationale? Does this have to do with the council's study on the preservation of the crab, limiting boats? In other words, you made what appears to be just an arbitrary decision. Different species, two tickets. Same species, one ticket. What's the rationale to make that decision? The council was trying to, this is a fishery that is in need of management. The council has taken a multi-step process and gone from a system that they described a moratorium process to this system that was adopted in 1998 called the Limited License Program, which was in essence intended to put a cap, a limit, on the number of people fishing in the fishery. The number of boats out there. To now, where they have just put in place a new regulatory scheme involving a fishery quota permit scheme, which is an even more restrictive scheme. This is a fishery that is in dramatic need of conservation regulation. For purposes of Chevron, what is the rationale then to treat this ticket as only one ticket? Chevron says, and the plaintiffs here rely primarily on cases interpreting agency interpretations of statutes. Under Chevron, the analysis for an agency interpretation of a statute is different from an agency's interpretation of its own regulations. The Chevron deference standards are stricter when a statutory interpretation is involved. But here, we're talking about regulatory interpretation. And here, the Supreme Court has recognized deference to an agency interpretation advocated in all kinds of circumstances. We cited in our brief our case, AUER case from the Supreme Court, decided in 1997. Where the court deferred to an agency's interpretation of its regulations that was advanced for the first time in an amicus brief filed in the Supreme Court. And the court said that interpretation was reasonable and therefore it's binding. Even if there are other reasonable interpretations of the regulations. We also cited the Bowles v. Seminole Rock case. An older case, a pre-Chevron case, but has been cited as still good law. Where the agency set forth an interpretation of its regulations in an administrative bulletin issued contemporaneous with a regulation, interpreting that regulation. And the Supreme Court deferred to that interpretation because it found it reasonable. And you want comparable deference for an internal email? This isn't just an internal email. The appeal officer decision, administrative decision on this, is very instructive in terms of how this interpretation was developed. And I would cite you to this. At excerpts of record 216 to 220, basically. Where here there were three written submissions in the agency administrative process. In this case, the RAM office made three written submissions to the agency. Those written submissions are at excerpts of record 106 to 109, 122 to 124. And the third one is attached as addendum E to our brief on appeal. Explaining what this interpretation is and how it was applied in this particular case. There was testimony from three people from the RAM office, including Phil Smith, the director of RAM. And two of his assistants. That testimony explains that what has been referred to in this record as the business rule, was based upon an interpretation of the regulations. There is the email that plaintiffs refer to, certainly. And that sets out the substance of what that interpretation is. But it was an interpretation developed by the office that was charged with implementing these regulations. Now, I read the testimony about the business rule and so on. But that didn't tell me how they arrived at it. That just told me the business rule we put into the computer. And we got the business rule from the email. Now, there is testimony. And it's not without reasons. I understand that there are reasons, and you're recapitulating them now. But there was no formal process leading up to the email. I mean, it was an internal office decision. There does not need to be a formal process under the kind of Chevron deference that we are asking for. There does not need to be a formal process. The Our case makes that clear. The Bowles v. Seminole Rock case makes that clear. But I think we're back to where you're saying that this email should get the same deference as the amicus brief and the other things in those cases. Well, it isn't just the email itself. It's how it was. This policy was applied consistently throughout this entire program to every single fisherman who applied for a permit. This policy was applied consistently throughout this entire program. It was the basis for deciding how this data received from the state. Do we have in the record any indication as to how many crabbers were disadvantaged by this one-ticket, one-harvest rule? We have one in front of us, obviously. Were there others? Do we know? I don't know that there's any information in this record that shows that definitively one way or another. What is certainly true is that the council, in making its deliberations, was making judgments about how many people to allow, how many fishermen, how many vessels to allow into this. Well, I've got no quarrel with the council. I mean, I take their regulation as there it is. The question is whether or not the one-ticket, one-harvest is an appropriate implementation of what the council did. I don't think that the regulatory change that you have asked about has the consequence that you were ascribing to it. What does a fish ticket then document if not landing? A fish ticket? That is to say, if you say with respect to somebody who comes in having had two takes, I'm staying away from the word harvest just because I want to stay away from the term of art, two takes of the same species of crab, separated in time, they come in and all they get is one fish ticket and you say, well, all you get is one harvest, it seems to me that you are implementing precisely the previous rule rather than the other rule because you're not allowing in any evidence that this might be considered as two harvests. It's conclusive that the landing is all you get to talk about. I don't think that NIMS intended the change that the plaintiffs are ascribing to that regulatory change, or that you are, when that change was made. The preamble language says, in the final rule, the preamble language says this is to more accurately reflect, more accurately describe what information we are interested in, what we want done. And that's basically the sum and substance of what that says there. It seems to me that the rule of one ticket, one harvest that you've implemented gives you less information because what you've now ignored is one of the two harvests. I understand there isn't a line drawn through one of them. We haven't ignored the two harvests. What do you mean the two takes? You don't want to confuse the harvests. All right. If the council, or excuse me, if NIMS was intending, this would be a very dramatic change from the way that this had previously been analyzed by the council. That's right, and they deliberately say we changed the wording. We're not doing landings anymore, we're doing harvests. But if you look at, for instance, there was a memo that the regional NIMS administrator sent to Washington headquarters, contemporaneous with this final rule, seeking approval for the final rule. It's at excerpts of record page 24, and the pertinent language is on page 25. This is the fourth paragraph down on page 25. This is a memo from Steve Penoyer, the regional administrator, to Roland Schmitten, and that paragraph says no major changes were made in the final rule due to comments received on the proposed rule. That last qualifier may be interesting. It doesn't say I didn't make any major changes, but we didn't make any changes in response to comments. Of the few changes made, most were editorial. In addition to the editorial changes, there was the change in definition from documented harvest was added to the final rule. This term more accurately describes behavior necessary for eligibility. But this would have been, if it is interpreted the way that the plaintiffs are asking for, this would have been a hugely significant change. But pay attention to the language you just read to me. The first sentence says no major changes were made in the final rule due to comments received on the proposed rule. This change was not made due to comments. We know that. Of the few changes that were made to the final rule, most were editorial changes designed. In addition to the editorial changes, the term documented harvest was added to the final rule. As I read that, that says, well, we didn't make any major changes in response to comments. We made a lot of editorial changes, and then we made this change, which is not a response to comment and is not an editorial change. We made the change to undocumented harvest. If there were a change that would have that consequence, there would have been a requirement to have significant analysis in this decision document as to what the impact of that change was going to be. Well, you know, I'm not sure that it's a major change. If this vote is right, as to them, but we keep asking, well, how many other votes are going to be affected? And as far as we can tell, none, or at least there's nothing in the record that says there's any other vote that's affected. That's because no one was proceeding on the assumption that, certainly NIFS was not proceeding on the assumption that the change of this regulatory term from legal landing to documented harvest was going to have an impact. You know, make a change from the way the council had analyzed this. That's what I'm getting at. The council talked about landings. You adopted the landing to be a fish ticket. Fish ticket is totally within the control of the process of the state. If they'd have put 15 of those different area harvests on one fish ticket, you would have accepted that, too. I don't think, am I right? You accepted the fish ticket. Whatever the state said on the fish ticket, you took it. And you said, give me three of those, whatever they say. Isn't that correct? No, that is not correct. That's what it is. It says three landings, and your interpretation of landing or documented harvest was a fish ticket. If a fish ticket showed a landing of three separate species of fish in one federal endorsement area, that would be three different landings. So you examined the fish ticket for content. They didn't examine the fish tickets, they examined the information that was given to them by the state of Alaska. The state of Alaska provided two NIMS, the state collects all this data, and provides that to NIMS. On the basis of that, NIMS creates the official LLP record. What NIMS did was to look at each one of these and translated this around the state's statistical area. It would translate that into what federal endorsement area or endorsement areas were these fish caught in. If there was fishing in more than one federal endorsement area for the same species, that would count as two documented harvests. If you look at the record... I said if there was fishing in more than two federal endorsement areas, not state statistical areas. That's what Alaska Trojan is relying on. Are we talking now about fishing for fish or fishing for crab? It's the same either way. Where is the federal endorsement area in the record here? I missed that too, because I was assuming that you were looking at the state area. No. Where is the federal area described? It's in the regulations. In what regulations? It is in 50 CFR 679. Do we have it in the excerpts? Yes, it is. The state areas and the federal areas are not synonymous. They are absolutely not synonymous. The fish ticket only gives you the basic knowledge to come up with three different federal endorsement areas. Is that your point? Yes. On page 41 of the excerpts of record, in the third column, the right hand column, about half way down, subcapital D says Aleutian Islands Brown King. This is the key regulation from which you have to start your analysis. It says in order to obtain what here is a brown king crab endorsement for the Aleutian Islands area, which is what they were seeking, that they have to obtain at least three documented harvests of any amount of brown king crab harvested in the area described in the definition for Aleutian Islands Brown King Area Species Endorsement. That is a federally defined area. Is there any question in this case that all three of these takings, which they say are all harvests, were done in that geographical area?  That is not a question in this case. What is the question? The question is that they have three documented harvests. The definition of documented harvest in the regulation says, documented in compliance with state law. State law requires, no they didn't violate state law, but it requires getting a fish ticket. The fish ticket is one form of documentation. On the fish ticket is other documentation. You've decided for purposes of your interpretation of the regulation that a fish ticket is required to document a harvest, when a fish ticket is synonymous with a landing. A fish ticket is not always synonymous with a landing. Why do you get a fish ticket if you don't do a landing? If you look at the state regulatory rule, which is reproduced in full, in our brief, red brief, it's the very last attachment. The addendum F, the very last attachment. Okay, I'm with you. Sub A, or well, let's start with sub C. What page am I on? It's the very first page of this attachment. It has page number two up in the upper right hand corner. Sub C, each buyer of raw fish, or each fisherman selling to a buyer, and each person or company who catches and processes his or her own catch, shall record each landing with a fish ticket. That's what I understood. When the federal regulation defining documented harvest says you have to comply with state law, that means you have to get a fish ticket. Well, of course you have to get a fish ticket. But it doesn't say in the regulation, and the only document that will be accepted is a fish ticket, and the only way a fish ticket will be counted is one harvest per fish ticket. It doesn't say that. For catcher processor vessels, NIMS has a different rule as to how their catch would be counted for purposes of getting a documented harvest. And that is that those vessels are required to file what are called weekly production reports. And NIMS decided that for purposes of those catcher processor vessels, their documented harvest would be based upon filing each one of those weekly production reports. That's not associated with a landing. I understand that. That's part of my point in saying you've chosen for this purpose, for crab, to require a fish ticket which comes with a landing, making it very clear that you do not regard the regulation that says harvest always to require a fish ticket or a landing. In this case, for crab, you do. Yes. Judge Brunetti, I want to respond to your comment about what the council looked at. This rule that we're talking about here, this business rule, this one fish ticket equals one documented harvest rule, that was not a rule, that's not a council rule. It's not something the council generated, it's not something that the council considered. The database that was before the council was the state fish ticket file. And the state fish ticket file, like the official record, separately identifies and documents these takings according to the statistical area in which they were caught. And so the council, when they analyzed the LLP and made their projections of what the harvest was, it was based on a data set that had already split these out. The rule, this rule that Ram came up with, that came along much later. So for the council's purpose, and the council never said three fish tickets. The council said, well, three landings. But again, you have to think about, what was the context in which they were thinking about that? They were thinking about it in terms of a database in which these were separate. Separate on that data they were looking at. Are those equated to one or two fish tickets at all, or just the raw data that came off the fish ticket? Well, of course, the state fish ticket file, as you might imagine, is huge. Because you have hundreds of fishermen delivering. So what they had is a computer program that then they extracted certain conclusions from. And in fact, if you look at, I believe it's, for instance, excerpt of record page 20, there's kind of an example there of the kind of conclusion that they drew from the record. So they did certain data runs, and they came up with projections about how many vessels would participate. But it was based upon a record in which these were separate. Again, the council never said fish tickets, the council said three landings, because they were thinking in terms of what the database was that was before that. Wait a minute, you say the council said three landings, well then they changed to say three harvests. NIMS changed, and in fact, in response to your honest question about the nature of the change, if you look at ER 33. I see, so the council said landings, NIMS and the regulation says no harvest reflects that more accurately. And NIMS described it as a substantive change, a substantive change from the proposed rule, and from the concept of a landing, because of course they had definition of landing, and so they were trying to make sure that they didn't get balled up, and that they were clear on what they meant. I think the final point I want to make is that it's important to keep again the context here of how determinations of eligibility were to be made. They were to be made on the record. I mean, that's what the LLP regulations say. You look to the record to make a determination, and if the record is incorrect, you have to correct the record, and then you will use it. And what we're saying is that if you look to the record, you see that these are distinct separate harvests, and that they ought to be counted as such, as what the plain definition of documented harvest is, which is a lawful harvest recorded in compliance with state regulations. I see my time is up. Two quick procedural points. Council mentioned that there is this subsequent program that has come into effect. I didn't know if that was the kind of thing that ought to be addressed in the 28J letter. If your honors want us to give you that site, we can do it, or I can just give it to you now. I'm not sure what bearing it has on this case. It does not, except for the fact that we mentioned it in our pleadings. And the second thing is just also to advise you so you're aware of what's happening. When that new program went into effect, it changed the ability of this vessel to go fishing. The season starts on August 15th. We went to the district court and requested an injunction pending appeal. As I understand, Federal Appellate Rule 8 requires you to go to the district court first before you approach this court. That motion was briefed. Under advisement, the district court has been there about a month. At some point, the district court will rule or not. I don't know. We haven't yet decided if we're going to approach this court with a motion. I understand there's the issue about, well, does it go to the motions panel? Does it go to the merits panel? I'm not weighing in on that at all. I'm just alerting you to the fact that there could be a motion for injunction. And this is a result of the fact that the new program, because this boat does not have a permit, the new program freezes it out so then you went and got the injunction of the district court pending our decision because if you get a permit out of us, then you get the new program. If we get a permit out of you, we get into the new program. If we don't get the endorsement, we're out. Then it does affect your case because we may get it with the injunction. Well, it affects the case. The new program affects the case in the sense that it's changed the facts on the ground as far as the fishery is going to start on August 15th. The question of whether or not they get this endorsement is still the issue that's before you. It's just that the consequences of that decision are now a little different than what they were when we briefed the case. Thank you very much. A very well-briefed and very well-argued case on both sides. Thank you very much. The case of Alaska Trojan Partnership v. Gutierrez is now submitted for decision. That concludes our oral argument calendar for today and for the week. And although there are not very many people here in the room to accept our thanks, thank all of you for a very hospitable week in Anchorage. All rise. This court for discussion stands adjourned. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.   Thank you. Thank you. Thank you. Thank you. Thank you. Yes it is. Yes. Yes. Yes. Okay. Okay. Okay. Okay.
judges: Goodwin, Brunetti, W. Fletcher